**Warren R. HORINEK, Appellant,**

v.

**The STATE of Texas, State.**

No. 2–96–565–CR.

Court of Appeals of Texas, Fort Worth.

June 11, 1998.

Discretionary Review Refused Dec. 9, 1998.

---

Robert Ford, Fort Worth, for Appellant.

Law Offices of Allan K. Butcher and Allan K. Butcher, Fort Worth, Allan K. Butcher, Jr., Stephenville, for Appellee.

Before CAYCE, C.J., and HOLMAN and DAY, JJ.

## OPINION

PER CURIAM.

Warren R. Horinek appeals from his conviction for murder. In his sole point on appeal, appellant challenges the factual sufficiency of the evidence to support the jury's guilty verdict. We affirm.

### I. Standard of Review

This court has the authority to review fact questions in criminal cases. *See Clewis v. State*, 922 S.W.2d 126, 129–30 (Tex.Crim.App. 1996). In reviewing the factual sufficiency of the evidence to support a conviction, we are to view "all the evidence without the prism of 'in the light most favorable to the prosecution.'" *Id.* at 129 (citing *Stone v. State*, 823 S.W.2d 375, 381 (Tex.App.—Austin 1992, pet. ref'd, untimely filed)). We may set aside the verdict only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *See id.* In performing this review, we are to give "appropriate deference" to the fact finder. *Id.* at 136.

### II. Appellant's Trial and Appellate Theories

Appellant, a former police officer, was indicted for the March 1995 murder of his wife, Bonnie Horinek. Appellant told emergency personnel and two police officers that an intruder had killed Bonnie, but his defensive theory at trial was that Bonnie had committed suicide. The State's theory was that appellant shot Bonnie while she was sleeping.

In this appeal, appellant infers that, because several expert witnesses testified that they could not rule out either suicide or homicide, the jury's verdict of guilty was so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. But none of the experts had access to all of the evidence in this case, although each *did* have an opinion as to the cause of Bonnie's death. Only the jury had both access to all of the evidence and the benefit of the experts' testimony and opinions.

### III. The Evidence

#### A. Bonnie Horinek

Several witnesses testified that Bonnie, a labor and employment lawyer at Jackson and Walker's Fort Worth office, led a busy, organized life, was well liked and respected, and did not appear depressed or despondent. Molly Mercey, a legal secretary who worked "very closely" with Bonnie, was with Bonnie at the office until about 7:15 p.m. on the evening of her death. Mercy testified that Bonnie was very busy and described Bonnie's "to do" list, travel plans, time records, letters to clients, meetings, depositions, and other work-related items. Bonnie was "extremely" well liked at work.

Another legal secretary, Marilyn Morgan, described Bonnie as "gracious, intelligent," and never despondent or depressed. Although she was extremely busy with a heavy caseload, Bonnie was well organized. Morgan left the office at 6:30 p.m. on the night of Bonnie's death. At that time, Bonnie was "upbeat"; she "came out and let [Morgan] know that things were going great."

Jay Rutherford, an attorney who worked with Bonnie at both Jackson and Walker and Law, Snakard and Gambill, testified that he had a close relationship with Bonnie. Rutherford described Bonnie as "an outstanding person," good hearted, very smart, articulate, and a role model for female attorneys at the firm. According to Rutherford, Bonnie was neither despondent nor depressed, even under the pressures of a big federal trial. He considered Bonnie a "rising star" who gave presentations to the firm's 200 attorneys at the annual firm retreat.

Another Jackson and Walker attorney, Susan Halsey, described Bonnie as "an excellent lawyer. Very well respected," who earned in excess of $100,000 per year. Bonnie was preparing to speak at a legal seminar and never appeared depressed, despondent, or anguished over anything at work.

One of Bonnie's neighbors described her as "very sweet," kind, intelligent, soft spoken, and pleasant. Patti Tavlian, a good friend of Bonnie's since high school, testified that she met Bonnie for lunch about six to eight months before Bonnie's death. According to Tavlian, Bonnie enjoyed life "extremely much," but was upset that day because she was planning to leave appellant. Bonnie had packed her van with her clothes and shoes and planned to check into a hotel after lunch. Tavlian testified that Bonnie said she was afraid of appellant but worried about what her family would think if her second marriage failed. Bonnie returned to appellant.

### B. Appellant

Witnesses testified that appellant was also pleasant when he was sober, but that he became obnoxious or violent when drunk. Pierre Peterman, a neighbor who lived across the street from the Horineks, described appellant as "a nice guy." However, appellant was often intoxicated, and Peterman did not like to be around appellant when he was intoxicated. Appellant contracted with Peterman to repair some holes in the sheetrock in the Horineks' home. One hole was in the wall above the bed in the master bedroom. After examining the hole, Peterman asked appellant if it was a bullet hole, and appellant responded, "Yeah." Appellant then related to Peterman how appellant had shot at Bonnie one night while Bonnie was in bed. Appellant said he was trying to get Bonnie's attention and scare her. Peterman estimated that the bullet hole was 16 to 20 inches above the pillow and that the incident occurred eight months to a year before Bonnie's death.

Kim Brooks, a former next-door neighbor of the Horineks, testified that she heard a loud male voice and three or four gunshots from the Horineks' house after midnight on May 12, 1992 and called the Benbrook police. Benbrook police officer Jerry Graham testified that he also heard a series of shots early that morning while on patrol. As he tried to determine the location of the shots, he was dispatched to the Horineks' house. Through a sliding glass door of the house, Graham saw appellant and a woman inside. Graham knocked on the door and identified himself. Appellant walked to the door, looked out at Graham, and closed the blinds on the door. Appellant was pacing, acting nervous. Graham again knocked and identified himself, and appellant finally opened the door. Appellant was extremely intoxicated and evasive about the gunfire, responding "[n]ot really," when Graham asked if he knew anything about it. Appellant eventually identified himself as a Fort Worth police officer and claimed he was showing Bonnie how to shoot a gun when it discharged into the swimming pool. Appellant claimed there was only one shot, which was inconsistent with what Brooks and Graham had heard. No arrests were made, as Bonnie did not appear to be in danger.

Holly Murtaugh, a Fort Worth police officer, went through the police academy with appellant and was a friend of the Horineks. She testified that one night at a dinner party at the Horineks' house, appellant complained that a neighbor once called the police after appellant played with firecrackers in the backyard. Just then, Bonnie walked into the room and said, "[o]h, you are telling Holly and John about the gun incident." Appellant realized he had been caught telling a lie and explained that he and Bonnie had gotten into an argument and he had taken a gun outside and fired it into the swimming pool.

In August 1993, Bonnie called Murtaugh at work and said appellant was extremely intoxicated and threatening suicide. Murtaugh got her supervisor's permission to go across town and help Bonnie. But Murtaugh could not calm appellant and had to call for police assistance. Other officers had to take appellant to John Peter Smith Hospital, because he was very intoxicated and a danger to himself and others. Appellant was handcuffed and put in the back of a patrol car. He told Bonnie he was humiliated and that she would "pay" for this. Murtaugh was

concerned for Bonnie's safety, and Bonnie appeared afraid.

Morgan, Bonnie's secretary, testified that appellant would often telephone Bonnie at work, and several times he sounded intoxicated. Rutherford described how Bonnie appeared in very bad shape one morning in August 1993 before a trial in federal court. Bonnie said she'd been up most of the night and was afraid of appellant. After the trial was over, on "multiple occasions" Bonnie conjectured to Rutherford that appellant could commit murder and get away with it because he was a cop and knew how to do it. Also, at a lawfirm bowling party, Rutherford and Bonnie were discussing a murder case that was then in the news. Appellant, who appeared intoxicated, told Rutherford that appellant could get away with murder because he was a cop and knew how to do it.

### C. Appellant's Police Training

Proper CPR must be done on a firm surface. According to training records, appellant received 8 hours of CPR training and 42 hours of first aid instruction. Fort Worth police officer Robert Rebner taught these courses, following Red Cross and American Heart Association course outlines. Rebner testified that he never instructed students to attempt CPR on a bed or other soft surface. For a gunshot wound to the sternum such as Bonnie's, Rebner testified that his students were trained to control or stop the bleeding by applying direct pressure over the wound and then to wait for advanced help.

Appellant's police training also included basic homicide investigation techniques, firearms, and crime scene search. Ron Pendergraft of the Fort Worth Police Department taught homicide investigation at the academy and testified that a person's inconsistent statements can lead to that person becoming a suspect. Although the primary emphasis in a recruit's homicide investigation training is merely to preserve the crime scene until detectives arrive, at the end of appellant's homicide instruction, the class was given a scenario involving a husband or wife shooting and asked to determine whether the death was a homicide or a suicide.

### D. The Evening of Bonnie's Death

Bonnie worked at her office until around 7:15 p.m. on March 14, 1995. Lisa York, a bartender at T.G.I. Friday's restaurant, served appellant numerous Coors Light beers that evening beginning when he arrived at 7:01 p.m. Testifying from the Horineks' bar tab and charge slip, York told the jury that Bonnie arrived at the bar around 7:34 p.m. and ordered a glass of Chardonnay. During the evening, York served appellant beer at 7:01, 7:26, 7:50, 8:22, 8:46, 9:08, 9:24, 9:50, 10:21, 10:48, and 11:04. York served wine to Bonnie at 7:34, 8:22, 8:58, 9:35, and 10:21. The couple paid with a charge slip that showed a time of 11:09 p.m.[1] and their tab was closed at 11:25 p.m. While serving the Horineks, York overheard appellant objecting to a business trip Bonnie was planning, but Bonnie was not crying, upset, or disturbed.

Mike Malone, an attorney, knew Bonnie from when they both worked at Law, Snakard. He and his family were at Friday's restaurant on March 14, and he saw Bonnie and appellant at the restaurant bar around 9:45 p.m. Malone stopped to say hello because he knew Bonnie was scheduled to speak at a seminar he had helped plan. Upon hearing that Malone was a lawyer, appellant, who was intoxicated, reached out and grabbed Malone's tie. During the course of Malone's conversation with Bonnie, appellant introduced himself several times and continued to shake Malone's hand. Bonnie did not appear intoxicated. Malone recalled that appellant seemed pretty drunk and that Bonnie was "somewhat" embarrassed by the "awkward encounter."

### E. The Scene

After Bonnie was shot at the Horineks' residence, appellant called 911, told the dispatcher something untelligible about what Bonnie had just done to herself, and demanded an ambulance. William Swinney, a Fort Worth firefighter and emergency medical technician, was the first person on the scene. When Swinney and the other firefighters in

1. The charge slip gives a time of 12:09 a.m., but York testified that the machine was an hour fast.

his unit arrived, they had to knock, ring the doorbell, and wait for someone to let them in. Appellant unlocked the door and directed them to the back room of the house. Appellant, who had blood on him, then left to control his dog. Swinney found Bonnie lying on a bed, with her arm dangling down beside the bed. Swinney tried to find a carotid pulse, but a cloth was wrapped so tightly around Bonnie's throat that he could not get his fingers under it. There was an obvious injury in the middle of Bonnie's chest and no pulse on her wrist. When appellant returned from securing his dog, he jumped on top of the bed and attempted CPR. The firefighters picked appellant up and placed him outside the room. The Medstar ambulance personnel did not attempt CPR because it would have been futile.

Swinney noticed a pistol on the bed, outside of Bonnie's reach. Also, appellant appeared "anxious" and said someone had broken into the house and shot Bonnie.

There was a lot of blood on the pillowcase wrapped around Bonnie's throat. If appellant believed Bonnie was bleeding from her neck, it would have been proper to apply pressure there to stop the bleeding, but it is not proper to wrap a tourniquet around her neck, especially when her chest wound was obvious. Also, Swinney testified that in all of the shooting suicides he had seen in seventeen years, the guns remained in the deceased's hands.

Fort Worth police officer Kevin Bock arrived at the Horinek residence after Swinney. Appellant was clad in underwear and a bloody T-shirt and had a lot of blood on himself. Appellant was disoriented and "very intoxicated." Officers had to repeat everything they said to appellant several times.

Fort Worth crime scene officer Lori Scheiern testified that a revolver and a shotgun were lying on top of the bed on which Bonnie was lying. The revolver was not in Bonnie's hand but was possibly within her reach. Scheiern did not notice any trauma other than a lot of blood and a blue cloth twisted around Bonnie's neck. Upon opening the revolver's cylinder, Scheiern found one spent round and live rounds in the other four chambers. The mattress, box springs, carpet, and carpet pad all had holes corresponding to the entry and exit wounds on Bonnie. The bullet was not recovered. Scheiern checked all doors, windows, and screens for signs of forced entry but found nothing unusual. Scheiern described appellant as shaking, "out of sorts," and intoxicated.

### F. The Investigation .

After Bonnie's death, appellant called Officer Pendergraft at 4:30 a.m. and asked him to personally investigate the death, which was impossible. Appellant sounded intoxicated during that call, as well as during two later calls. During the second call, appellant told Pendergraft his theory that an intruder came in through the bedroom window and attacked and shot Bonnie; then, upon leaving, the intruder took the bullet with him. Pendergraft testified that family members in a suicide situation can make up outlandish explanations for the manner of death, and he could not form an opinion about appellant's case without doing a full investigation.

In May 1995, appellant called Fort Worth police officer Ron Babcock at 7:00 a.m. Appellant sounded intoxicated and asked if Babcock had any information on the investigation into Bonnie's death. When Babcock said he did not, appellant related his intruder theory. In June 1995, appellant, again intoxicated, again asked Babcock for information.

Dr. Gary Sisler, the deputy medical examiner for Tarrant County, found an entry wound on Bonnie's chest consistent with a close contact gunshot.[2] There was no evidence of a struggle, and there were no defensive wounds. The bullet penetrated the sternum, which deflected it, and then went through the heart, liver, lung, and soft tissue between the ribs. Sisler determined the cause of death to be laceration of the heart and lung due to a gunshot; however, he could not determine whether the death was a

---

**2.** A "close contact" or "hard contact" gunshot wound occurs where the barrel of the gun is

pressed into the person when the gun is fired.

suicide or homicide. Although Sisler eventually classified the manner of death as "undetermined," he told the grand jury the evidence would lead to it being a suicide.

Dr. Cathal Grant, a board-certified forensic pathologist and psychiatrist, testified for the State. He had served as medical director of Harris Hospital, was licensed in Texas, Pennsylvania, the United Kingdom, and Ireland. In his practice, Grant treated people who had suicidal tendencies, and he had also taught interns and other physicians how to recognize and treat someone who might have suicidal tendencies.

Grant conducted a psychological autopsy of Bonnie and opined "that it appeared very unlikely that this individual would be the sort of person to kill herself." This conclusion was the result of extensive interviews with Bonnie's father and her ex-husband, friends, a coworker, and a review of her medical records, bank statements, work records, her appointment book, and even the fortune cookies Bonnie kept in her purse. Although Bonnie's was the first psychological autopsy Grant had conducted completely by himself, he had participated in two during his training. Grant found that Bonnie had plans for the future, was a hard worker, had a good sense of humor, a good family, a successful career, was optimistic, was not anxious, ill, or on medication, and had not suffered a nervous breakdown. Bonnie had had thyroid surgery, which had led to five or six years of depression,[3] but that surgery was in November 1985, nine-and-a-half years before her death.

Although appellant questioned the validity of the psychological autopsy process, Grant testified that "suicide as an option is open to any of us intellectually at any time." While Bonnie fit some of the potential suicide criteria, such as availability of a firearm, an unstable marriage, and intoxication,[4] she did not fit a lot of the criteria. Grant maintained his opinion that Bonnie did not commit suicide, pointing out his interview with Bonnie's

ex-husband as an example of his interviewees' objectivity. Bonnie's ex-husband "talked about her bad points as much as he could." But the ex-husband related to Grant that, even when they argued, Bonnie would "never go into a huff. She would argue tactically like a lawyer, and then she'd get over it." Bonnie and her ex-husband had philosophically discussed suicide, and she was against it.

### G. The Weapon

Fort Worth police officer Clifford Cook had held a federal firearms dealer's license for several years and sold handguns to fellow police officers. He identified State's Exhibit 1, a .38 caliber Smith and Wesson "Chief" revolver, as a handgun he had purchased in 1985 or 1986. Cook recalled selling appellant such a weapon. However, the gun had been modified after the sale—the hammer had been "bobbed," a common practice among police officers who carry back-up weapons.

Richard Ernest, the senior firearms examiner for the Tarrant County medical examiner's crime lab, testified that shooting into concrete can cause a bullet to disintegrate. He described a hard contact gunshot hole in Bonnie's nightgown and found the holes in the carpet and pad to be consistent with a gunshot. The carpet fibers had lead content consistent with a fragmented bullet. As for the weapon itself, it was a double-action revolver, meaning that it could be fired in two ways: single-action and double action. The hammer of the gun had been cut off, making it very difficult to cock the gun for "single action" firing. To fire without cocking, in a "double action," the trigger required a pull of 9.5 to 10 pounds. Ernest testified that it would take a "good bit of hand strength" to pull that much pressure and, after the shot, the person would relax with gun in hand. In such a hard contact shot, there would be less "blow back"[5] onto the gun, but if a second person were holding and firing the gun, the blow back could go on to the person holding the gun.

---

3. Bonnie's medical records indicated that depression is typical after thyroid surgery.

4. At the time of the autopsy, Bonnie's blood alcohol level was .13.

5. "Blow back" consists of tissue, blood, and other biological materials that come back out of the gunshot hole upon firing.

## H. The Blood Spatter

Appellant called Max Courtney, a forensic consultant, as an expert witness. Courtney testified that there was no blood in appellant's home office and very little blood outside the vicinity of Bonnie's body. Luminol testing indicated no clearly discernable foot, hand, or shoe patterns but did show traffic patterns at the foot of the bed where Bonnie was found. Other blood was found on the telephone keys and on the wall, which was consistent with the bloody pillowcase around Bonnie's neck being removed in a sweeping motion and brushing the wall. Blood was smeared on both Bonnie's and appellant's faces, consistent with appellant administering CPR.

Courtney testified that Bonnie's body was flat when the shot was fired and that the angle of the shot would have been somewhat difficult for someone else to inflict. Courtney used a mannequin to demonstrate the bullet trajectory through the body and how a killer would have to stand awkwardly to hold the gun in the appropriate position. Also, there were no defensive wounds on the body.

Courtney explained that the cartridge was a high pressure load and, as for the trajectory through the body, the greater the bullet's energy, the less the bullet would ricochet. Courtney found blood on Bonnie's left palm and the undersides of her left fingers and surmised that the blood got there while her hand was on her abdomen or chest. Also, blood had run down the palm, thumb, and index finger of Bonnie's right hand, and almost all of the blood on the gun was found on the left side. There was a large area of transferred blood and encrusted blood on the gun, and blood had soaked into the gun. Because there was no blood on the grip, Courtney believed that the gun had lain on Bonnie's chest while the blood was collecting, and that the blood on the gun explained the blood on her hands.

Courtney theorized that, if Bonnie had held the gun in her right hand and then rested it on her chest after the shot, that action would have put the appropriate bloody areas of the gun in contact with her chest where the blood was pooling up. Courtney testified that he would not expect a gun used in a homicide to be soaked in blood like the gun in this case unless the shooter turned it over and held it there for awhile, protecting the grip but allowing the other parts to soak in blood. Taking into account the totality of the physical evidence, the medical examiner's report, the police report, the time line,[6] his reconstructions, and appellant's statements, Courtney concluded that the facts supported a suicide rather than a homicide. Although Courtney was a noted expert in bloodstain interpretation and had published materials and taught police classes on bloodstain interpretation, he did not testify that he had examined the bloodstains on the T-shirt appellant was wearing on the night of Bonnie's death, and there is no evidence that he did.

The State called Tom Bevel as an expert witness. Bevel, a forensic consultant who specialized in bloodstain pattern analysis and crime scene reconstruction, had testified in 29 states and six countries at the time of trial, and is certified by Scotland Yard's Hinden Police College. Bevel was Courtney's instructor in the field of bloodstain pattern analysis.

Bevel examined appellant's bloody T-shirt. The smeared, absorbed blood was easily recognized, and there was also a blood spatter near the top and collar of the shirt that was visible to the unaided eye. Other blood spatter stains were invisible to the unaided eye. With the aid of a stereoscopic microscope, Bevel counted more than 100 atomized blood spatters on the upper left-hand shoulder of the shirt that were consistent with a high-velocity occurrence. The majority of the spatters were one-tenth of a millimeter in diameter.[7] Bevel explained that the presence of the microscopic blood spatters on appellant's shirt meant that appellant was close to Bonnie at the time she was shot.

---

6. Approximately 26 minutes elapsed from the time Bonnie paid the Horineks' bar tab at Friday's and the time appellant placed the 911 call.

7. A millimeter is approximately .039 of an inch in diameter. *See* MERRIAM WEBSTER'S COLLEGIATE DICTIONARY 733 (10th ed.1994). Most of the blood microscopic blood spatters that Bevel discovered were only one-tenth that size.

Bevel ruled out appellant's attempt to give Bonnie CPR as the cause of the microscopic blood spatters on appellant's shirt. Blood spatters in situations where CPR is given to a person with a chest bullet wound are typically one millimeter in diameter or larger, not one-tenth of a millimeter in diameter like most of those on the shoulder of appellant's shirt. Also, for CPR to have produced the spatters, the bullet hole in Bonnie's nightgown would have had to stay in alignment with the wound in her chest throughout the CPR. If the gown was moved at all, it would have become a barrier to blood spattering.

Bevel opined that if Bonnie had fired the shot, the gun would have dropped and the gun's grip would have come into contact with the blood on her chest. But the grip on the gun was blood free. Bevel testified that the gun had a very firm-to-hard trigger pull, and Bevel, who was similar in stature to Bonnie, had trouble reaching around to pull the trigger like Courtney had demonstrated with his larger hands. As for the lack of struggle, Bevel testified that he would not expect a struggle if Bonnie was asleep when she was shot.

Bevel also offered an explanation for the lack of blood in the rest of the house. There would have been no bloody footprints unless the shooter had stood in the blood that had pooled, such as on the bed. If a person were to go into a room to a sleeping person, hold the gun to the person's body, and fire, dropping the gun and then backing away, all Bevel would expect to find would be some blow-back blood on the shooter's left shoulder. Although he had not reviewed everything, Bevel could not rule out homicide as a manner of death.

On cross-examination, Bevel also admitted that he could not "with one hundred percent certainty" rule out suicide either, but opined that Courtney's conclusions were "certainly incorrect." Finally, Bevel testified that if the gun were held perpendicular to the skin, the spatter could come out in any direction, following a path of least resistance. The back spatter would come out in a cone shape from the wound, back and onto the gun—as it did in this case, where Bevel found atomized blood on the gun.

### I. Varnon's Testimony

Fort Worth police detective James Varnon also investigated Bonnie's death. Upon completing his investigation, Varnon concluded that Bonnie had committed suicide because:

- Appellant gave Varnon a statement that Varnon considered to be "consistent with the physical evidence" in the case. Due to a sustained hearsay objection, Varnon did not elaborate on what the statement was. However, Varnon admitted during cross-examination that he did *not* know appellant had told several people that an intruder had killed Bonnie. Varnon admitted such a statement could not be consistent with his opinion that Bonnie's death was a suicide.

- Bonnie's body was lying face up on her bed, in line with the edge of the bed. Varnon testified that before a suicide, the subject will often lie down and get comfortable, "like they are just going to sleep." There was no evidence of what position Bonnie usually went to sleep in.

- Bonnie's eyeglasses were found neatly folded on the night stand. The evidence shows that Bonnie's eyesight was so bad that she could not see anything without her glasses. Varnon testified that taking off eyeglasses is a common action in preparing for suicide.

- The weapon was found near Bonnie's body. Varnon testified that killers usually take the gun with them, but "there can be an exception to that."

- Gun ownership. During the initial investigation, Officer Scheiern found the gun holster between the mattress and box springs under Bonnie's body. Therefore, Varnon thought that Bonnie owned the gun that killed her. But defense counsel corrected him, stating that either appellant or Bonnie owned the gun—and there is evidence that the gun was actually appellant's backup weapon. There is no evidence of when the holster was placed under Bonnie's side of the bed or who put it there.

- In Varnon's opinion, the angle of the wound track was consistent with a self-

inflicted wound. Varnon believed it would be awkward for another person to hold the gun in the position that caused the wound track.

- Homicides almost never involve a firmly pressed contact wound like the one on Bonnie. Also, the wound location—just to the left of center—is a location common among suicide subjects. Varnon did not state whether the wound location is common or uncommon for homicides.

- Varnon found no high velocity blood spatters. However, he did not perform any testing on appellant's T-shirt. All of Varnon's testimony and his report were based on the blood that he could see, unaided by a microscope.

- The absence of a bullet. Varnon testified that he could not figure out why someone would kill a person and take the bullet, yet leave the gun; therefore, this was not a homicide. Varnon did not explain why the bullet was more likely to be missing if Bonnie shot herself than if someone else shot her.

In Varnon's opinion, the crime scene involved so many facets that it would have been impossible to fake a suicide if a homicide had actually occurred. Nonetheless, in addition to his lack of knowledge about appellant's inconsistent statements concerning Bonnie's death, Varnon admitted that he did not know certain things when he drew his conclusions about suicide. For instance, Varnon admitted he did not know that appellant had threatened Bonnie that she "would pay" after she had him taken to John Peter Smith hospital to prevent him from committing suicide; that appellant had boasted that he could get away with murder because he was a cop and knew how to do it; and that appellant's police academy crime scene investigation training exercise involved this same factual scenario—suicide of or homicide by a spouse.

Finally, Varnon opined that several factors in the case could indicate either a homicide or a suicide:

- A domestic argument might have occurred right before the shooting—although he admitted that he had no knowledge of any domestic quarrel.

- The presence of alcohol consumption.
- Appellant's history of assaultive behavior against Bonnie.
- No suicide note. Notes are found in only 20 percent of suicides.
- Lack of fingerprints on the gun.

### IV.  Conclusion

What weight to give contradictory testimonial evidence is within the sole province of the jury because it turns on an evaluation of credibility and demeanor. *Cain v. State,* 958 S.W.2d 404, 408–09 (Tex.Crim.App. 1997). Accordingly, we must defer to the jury's weight-of-the-evidence determinations. *See id.* at 408. The jury could have given more weight to the testimony supporting the homicide theory than it did to the testimony supporting the suicide theory. Thus, after reviewing all of the evidence in this case, we hold that the jury's verdict is not so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. Accordingly, we overrule appellant's point and affirm his conviction.