**Affirmed and Memorandum Opinion filed December 20, 2011.**



**In The**

# 𝕱𝖔𝖚𝖗𝖙𝖊𝖊𝖓𝖙𝖍 𝕮𝖔𝖚𝖗𝖙 𝖔𝖋 𝕬𝖕𝖕𝖊𝖆𝖑𝖘

---

**NO. 14-10-00953-CR**

---

**RONNEY WEEMS, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the 182nd District Court
Harris County, Texas
Trial Court Cause No. 1194236**

---

## MEMORANDUM OPINION

Appellant Ronney Weems appeals his felony conviction for murder, challenging the sufficiency of the evidence to support his conviction and claiming that the trial court erred in denying his motion to suppress statements he made at the scene and at the police station. We affirm.

### FACTUAL AND PROCEDURAL BACKGROUND

Appellant was charged by indictment with the offense of murder, to which appellant pleaded "not guilty." In the jury trial that followed, the evidence showed that

emergency responders arrived at appellant's home in response to appellant's 9-1-1 call reporting that his girlfriend, the complainant, had shot herself.

A firefighter testified that he observed the complainant, who was visibly pregnant, lying in front of a couch inside the home and a firearm laying beside her underneath a coffee table. The complainant had been injured by a gunshot wound to her head. The complainant was transported by ambulance to the hospital, where she later died.[1]

According to the firefighter, appellant explained at the scene that he and the complainant had argued. The complainant brandished a firearm and told him to leave. Appellant claimed to have retreated to gather some belongings from another room and was returning to the living room when he heard a shot.

Officer Crowder testified that he arrived on the scene and observed paramedics tending to the complainant in an ambulance. Upon finding appellant inside the home, the officer asked him what had happened. Appellant told the officer that the complainant had shot herself and that he did not see the firearm until after she fired the shot.

Because appellant was in the home at the time of the shooting, Officer Crowder believed that protocol necessitated testing appellant's hands for gunshot residue. The officer placed appellant in handcuffs to prevent appellant from washing or wiping his hands until the test had been conducted. As he was doing so, the officer explained to appellant that the handcuffs were strictly for preservation of evidence. According to the officer, appellant appeared to understand the purpose of the handcuffs. At some point while he was handcuffed, appellant asked to wash his hands; Officer Crowder did not observe any blood on appellant's hands and declined appellant's request.

---

[1] Medical records reflect that narcotics were found in the complainant's system. Doctors delivered the complainant's baby by Caesarean section. The baby had a gestational age of approximately 36 weeks at the time of delivery. According to two healthcare providers, the child suffers from limited mental and physical capabilities likely attributable to the gunshot wound the complainant sustained shortly before the child's birth.

Officer Crowder stated that he was accompanied by a rookie officer at the scene and that he explained the procedure of securing the scene and the need for handcuffs to the new officer. After hearing this explanation, appellant, who was wearing handcuffs, volunteered that his fingerprints might be on the firearm because he moved it to attempt resuscitation of the complainant.

A crime scene investigator testified that, upon his arrival, he took photographs of the scene, conducted the gunshot-residue test of appellant's hands, and collected evidence. This investigator discovered that the revolver at the scene was missing a spent casing, which should have been located under the hammer inside the cylinder of the revolver unless it had been removed. Instead, the revolver contained a live shell inside and nothing else. The crime scene investigator notified the homicide division that the complainant's death was not necessarily a suicide. Appellant explained to the crime scene investigator that he was facing away and heard a "pop" and that he did not see the complainant shoot herself.

Although Officer Crowder testified that he intended for appellant to remain in handcuffs for a brief time—for the interval it took for the crime scene investigators to arrive and conduct the gunshot-residue test—appellant's handcuffs were not removed until about an hour-and-a-half later when the homicide investigators arrived and after the gunshot-residue test had been performed. According to the record, during the time when appellant remained handcuffed, Officer Crowder and the other officers engaged in conversation, but they did not direct questions to appellant. Some of the conversations involved contacting the complainant's next of kin. During those conversations, appellant volunteered relevant information.

Homicide investigators testified that they came to the scene because information about the missing fired casing from the revolver was considered a "red flag" about whether the complainant had committed suicide. As soon as the homicide investigators arrived, appellant's handcuffs were removed. In response to questions about what

happened, appellant explained to Investigator Martinez, a homicide investigator, that the complainant, who was sitting on a large sofa, placed a blanket over her head, and shot herself. Investigator Martinez noted a few inconsistencies in appellant's explanation, namely, that he did not observe any bullet holes in the blanket and did not locate any spent shell casings on the scene. The investigator also noted that most of the blood at the scene was in front of the loveseat and on its cushions and not on or near the large sofa. But, the investigators stated that they had no information upon which to detain appellant.

Appellant left the home briefly and returned. Appellant went inside the home and answered more questions from the homicide investigators. Officer Crowder heard appellant explain that he and the complainant were arguing when the complainant produced a firearm and threatened to shoot him. According to appellant's explanation, he struggled with the complainant over control of the firearm and the complainant eventually gained control of the weapon; appellant claimed to have backed away into a hallway and that is when he heard the gunshot. At one point, appellant had indicated to Officer Crowder that the complainant had been sitting on a loveseat; appellant indicated to Investigator Martinez that the complainant had been sitting on the large sofa.

Investigator Martinez testified that he received appellant's consent to search the home. After examining the revolver found at the scene and noting that a fired casing had been removed from the weapon, Investigator Martinez asked appellant about the missing fired casing. Appellant did not offer an explanation.

Investigator Martinez explained to appellant that the police would transport him to a police station to give a recorded witness statement about the incident. Appellant was placed in handcuffs according to department protocol and transported in a patrol cruiser to the police station. Each officer testified that department protocol required any individual that is to be transported in a police unit to be handcuffed to ensure officers' safety; however, the officers did not explain this protocol to appellant.

4

Meanwhile, officers continued their investigation at the scene. After appellant left for the police station, officers discovered narcotics under a mattress in appellant's home.

After appellant arrived at the police station, appellant was not advised of his rights and he was not in handcuffs. The record does not reflect when the handcuffs were removed. Appellant gave a recorded statement to Officer Nabors about the events surrounding the shooting. In the recorded statement, appellant described attempting to take the gun from the complainant's hands by grabbing the end of the barrel and that he pushed the complainant away from him onto a sofa. In his statement, appellant demonstrated for Officer Nabors and explained how the complainant held the revolver with her left hand several inches away from her temple on the left side of her head so that the trajectory of the bullet would have been straight across her head. Officer Nabors replicated appellant's actions at trial. The audio recording of appellant's statement was played in open court during trial.

Sergeant Wyers testified that he arrived at the police station to advise appellant of his *Miranda* rights and to place appellant under arrest for possession of the narcotics found in appellant's home.[2] Sergeant Wyers also planned to speak with appellant about inconsistent statements about the complainant's death that appellant made at the scene. According to Sergeant Wyers, appellant requested a lawyer at that time, and the officer ended the interview. Appellant subsequently was arrested and charged with the complainant's death.

At trial, a medical examiner testified that the complainant suffered a fatal gunshot wound to her head. The bullet's trajectory began at the top left side of her head, traveled downward, and lodged in the lower right part of her jaw. The medical examiner opined that, based on the presence of stippling, the weapon was held from one to three feet away from the complainant's head. The medical examiner stated that the wound was atypical

---

[2] The record does not reflect whether appellant was charged with any offense related to the narcotics found in his home.

5

of a suicide wound and once characterized the circumstances as "impossible" that the complainant shot herself, noting the difficulty in maintaining a distance of one to three feet from her head while firing the weapon resulting in the same trajectory. According to the medical examiner, given the trajectory of the bullet and the stippling indicative that the firearm was held from one to three feet away, it would be "awkward," but "possible," for the complainant to have shot herself. The medical examiner testified that it was not reasonable to believe that the complainant committed suicide.

The results from the gunshot-residue test were inconclusive. The test results reflect low levels of gunshot residue found on appellant's hands, but the forensic evidence manager could not state conclusively based on the test results whether appellant had fired a weapon. The revolver found at the scene was identified as the firearm that fired the bullet lodged in the complainant's jaw bone.

The complainant's sister testified that she received a call from appellant earlier on the day of the complainant's death, from the complainant's cell phone. Appellant asked the complainant's sister to send someone to get the complainant from his home. The sister testified that the complainant was right-handed. The record reflects that the complainant was not depressed and was looking forward to the birth of the baby and the upcoming Christmas holiday.

According to appellant's testimony at trial, he and the complainant had argued on the day before her death because he had cheated on her. Appellant testified that he contacted the complainant's mother and sister to ask them to pick her up from his home; the complainant spent the night at a hotel. She arrived at his home the next morning to retrieve her belongings and pulled a weapon from her coat pocket and aimed it at him as she sat on the large sofa. Appellant claimed to have struggled with the complainant for control of the weapon and that he pushed her down. Appellant testified that he ran from the front door of the home and heard the gun fire as he was coming back inside, after being away from the home for less than two minutes. He notified authorities that the

6

complainant had shot herself and attempted to resuscitate her; emergency responders arrived shortly thereafter.

When asked about the inconsistencies between his testimony at trial and his recorded statement to authorities, appellant explained that the events unfolded quickly. Appellant testified that as he came into the home, he saw the complainant's left arm raised in a "gesture" and that he did not see the gun fire; he only heard the gun fire.

The jury found appellant guilty as charged. Appellant was sentenced to seventy-five years' confinement. Appellant now appeals his conviction, challenging the sufficiency of the evidence and the trial court's ruling on the suppression of evidence.

## SUFFICIENCY OF THE EVIDENCE

In appellant's second issue, he challenges the legal and factual sufficiency of the evidence to support the jury's verdict that he committed the offense of murder. A majority of the judges of the Texas Court of Criminal Appeals has determined that "the *Jackson v. Virginia* legal-sufficiency standard is the only standard that a reviewing court should apply in determining whether the evidence is sufficient to support each element of a criminal offense that the State is required to prove beyond a reasonable doubt." *Brooks v. State*, 323 S.W.3d 893, 895 (Tex. Crim. App. 2010) (plurality op.) (Hervey, J., joined by Keller, P.J., Keasler, and Cochran, J.J.); *id.* at 912–15 (Cochran, J., concurring, joined by Womack, J.) (same conclusion as plurality). Therefore, in this case we review the evidence under the *Jackson v. Virginia* standard and do not separately refer to legal or factual sufficiency.

In evaluating a legal-sufficiency challenge, we view the evidence in the light most favorable to the verdict. *Wesbrook v. State*, 29 S.W.3d 103, 111 (Tex. Crim. App. 2000). The issue on appeal is not whether we, as a court, believe the State's evidence or believe that appellant's evidence outweighs the State's evidence. *Wicker v. State*, 667 S.W.2d 137, 143 (Tex. Crim. App. 1984). The verdict may not be overturned unless it is irrational or unsupported by proof beyond a reasonable doubt. *Matson v. State*, 819

S.W.2d 839, 846 (Tex. Crim. App. 1991). The trier of fact "is the sole judge of the credibility of the witnesses and of the strength of the evidence." *Fuentes v. State*, 991 S.W.2d 267, 271 (Tex. Crim. App. 1999). The trier of fact may choose to believe or disbelieve any portion of the witnesses' testimony. *Sharp v. State*, 707 S.W.2d 611, 614 (Tex. Crim. App. 1986). When faced with conflicting evidence, we presume the trier of fact resolved conflicts in favor of the prevailing party. *Turro v. State*, 867 S.W.2d 43, 47 (Tex. Crim. App. 1993). Therefore, if any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt, we must affirm. *McDuff v. State*, 939 S.W.2d 607, 614 (Tex. Crim. App. 1997).

A person commits the offense of murder if that person intentionally or knowingly causes the death of an individual or if that person intends to cause serious bodily injury and intentionally or knowingly commits an act clearly dangerous to human life that causes the death of an individual. *See* Tex. Penal Code Ann. § 19.02(b)(1), (2) (West 2011).

Appellant claims that the evidence against him is entirely circumstantial. Sufficiency of the evidence does not require each fact to point directly and independently to a party's guilt; rather, the jury's verdict will withstand a sufficiency challenge as long as the combined and cumulative force of all the circumstances permits the conclusion that the jury was rationally justified in finding the accused guilty of each element of the crime beyond a reasonable doubt. *See Johnson v. State*, 871 S.W.2d 183, 186 (Tex. Crim. App. 1993).

Although appellant claimed that the complainant shot herself, the medical examiner testified that it was not reasonable to believe that the complainant committed suicide. *See Williams v. State*, 294 S.W.3d 674, 687 (Tex. App.—Houston [1st Dist.] 2009, pet. ref'd) (concluding evidence was sufficient to support conviction for capital murder based on the medical examiner's testimony that a child's injuries could not have been inflicted in the manner the accused offered as an explanation). The medical

8

examiner found evidence of stippling on the complainant's skin indicative that a firearm was held from one to three feet away from the complainant's left temple. The trajectory of the bullet followed a downward path from the complainant's left temple to the back of her lower right jaw. At one point, the medical examiner characterized the evidence as indicating it was "impossible" that the complainant shot herself. Later, the medical examiner characterized such an event as "possible," yet "awkward," noting that the evidence is atypical of the prior one hundred suicide autopsies that he had performed. The credibility of the witnesses and the weight to be given to their testimony is exclusively within the purview of the jury, who apparently chose to believe the medical examiner's theory over appellant's explanation of the events. *See Porter v. State*, 86 Tex. Crim. 23, 215 S.W. 201, 204 (Tex. Crim. App. 1918) (providing that factfinder was entitled to credibility determinations of witnesses in case in which accused was convicted of murdering his pregnant girlfriend despite appellant's contention that the complainant committed suicide). Given the medical examiner's testimony, it is reasonable for the jury to have concluded that the complainant did not shoot herself. *See Williams*, 294 S.W.3d at 687.

The jury heard testimony from multiple emergency responders and investigators that appellant offered inconsistent accounts of what happened. Contrary to appellant's claims on appeal that every version of his story in giving his recorded statement was consistent in that he did not see the complainant shoot herself, the record reflects that appellant demonstrated for Officer Nabors that he had seen the complainant hold the firearm in her left hand and point it at her head. At other times, appellant denied having seen the complainant shoot herself. The jury reasonably could have concluded, based on the testimony they heard regarding appellant's various versions of the events, that appellant was lying and that he was the one who shot the complainant. *See Kemmerer v. State*, 113 S.W.3d 513, 516 & n.3 (Tex. App.—Houston [1st Dist.] 2003, pet. ref'd) (providing that jury could have viewed an accused's changing accounts of what happened as evidence of guilt).

Although appellant asserts that no evidence reflects that he shot the complainant, the physical evidence did not match appellant's inconsistent accounts of what happened. According to the investigators, some evidence suggests that the complainant's death was not a suicide. They specifically pointed to the following: (1) the fired bullet casing was missing from the chambers of the revolver and only a live round was found in the firearm; (2) no holes were found in the blanket that appellant claimed the complainant placed over her head before shooting herself; and (3) most of the blood was found on or near a loveseat when appellant claimed, in one account, that the complainant was sitting on a large sofa at the time of the shooting. Investigators did not locate the fired bullet in the chambers of the revolver, and investigators did not ever locate the spent bullet elsewhere. Accepting as true that only appellant and the complainant were in the home at the time of the shooting, the record reflects that the complainant was incapacitated by the gunshot wound and could not have removed the spent shell from the revolver. Likewise, an expert testified that the spent casing would not have discharged from the revolver's chamber, even if the firearm were dropped, and that the fired casing would have had to have been manually removed from the chambers. The jury reasonably could have believed that the only other person who could have removed the spent casing was appellant.

Appellant asserts that no evidence connected him to the weapon because the gunshot-residue tests were inconclusive. According to one witness, an inconclusive test indicates that some gunshot residue was found in a sample, but it cannot be concluded that the person from whom the sample was taken fired a weapon. Although the tests were inconclusive, some residue was detected on each of appellant's hands. The forensic evidence manager testified that it is easy to remove gunshot residue from a person's hands by rinsing with water, or even touching a wall or putting his hands in his pocket. Officer Crowder noted that appellant's hands appeared to have no blood on them even though appellant claimed to have used a rag on the complainant's wound to stop the bleeding. The jury reasonably could have believed from this testimony that appellant

washed his hands and removed the blood and thereby also removed gunshot residue before the police arrived.

The record reflects that the complainant was eager for her baby's arrival and looked forward to celebrating the upcoming Christmas holiday with an older daughter; the complainant was not depressed or suicidal. *See Porter*, 86 Tex. Crim. 23, 215 S.W. at 204 (providing that evidence that the complainant was cheerful, in good humor, jolly, and apparently in good spirits shortly before her death was evidence tending to disprove an accused's contentions that the complainant committed suicide); *Horinek v. State*, 977 S.W.2d 696, 701 (Tex. App.—Fort Worth 1998, pet. ref'd); (holding evidence was sufficient to support conviction for murder instead of a suicide by the victim when the evidence showed, in part, that the complainant had plans for the future and was not depressed). The State offered evidence that the complainant's death was not the result of suicide, and a rational finder of fact reasonably could have determined from the cumulative force of the circumstantial evidence that the State proved the essential elements of the charged offense beyond a reasonable doubt. *See Porter*, 86 Tex. Crim. 23, 215 S.W. at 204 (providing that evidence supported conviction for murder instead of accused's claims that the complainant committed suicide); *Horinek*, 977 S.W.2d at 701 (holding evidence sufficient to support conviction for murder). We conclude the evidence is sufficient to support appellant's conviction. Appellant's second issue is overruled.

### RULING ON APPELLANT'S REQUEST FOR SUPPRESSION OF THE EVIDENCE

In his first issue, appellant claims the trial court should have granted his motion to suppress inculpatory statements he made at the scene and at the police station. According to appellant, he was in custody at the time he made those statements, and police officers did not advise appellant of his *Miranda* rights.

We review a trial court's ruling on a motion to suppress under an abuse-of-discretion standard. *See Villareal v. State*, 935 S.W.3d 134, 138 (Tex. Crim. App. 1996).

11

At a hearing on a motion to suppress, the trial court is the sole judge of the credibility of the witnesses and the weight to be given their testimony. *Romero v. State*, 800 S.W.2d 539, 543 (Tex. Crim. App. 1990). We afford almost complete deference to the trial court's determination of historical facts supported by the record, as well as to mixed questions of law and fact dependent on the determination of a witness's credibility and demeanor. *See State v. Ross*, 32 S.W.3d 853, 856 (Tex. Crim. App. 2000). We consider issues that present purely legal questions under a de novo standard. *See id.* As relevant in the case at hand, a trial court's ultimate determination whether an individual was in custody presents a mixed question of law and fact. *Herrera v. State*, 241 S.W.3d 520, 526 (Tex. Crim. App. 2007).

The State may not use exculpatory or inculpatory statements stemming from the custodial interrogation of an accused unless procedural safeguards were effectively used to secure the accused's privilege against self-incrimination. *See Miranda v. Arizona*, 384 U.S. 436, 444, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966). The Texas Legislature has codified these procedural safeguards in the Texas Code of Criminal Procedure. *See* Tex. Code Crim. Proc. Ann. art. 38.22 (West 2005). Specifically, article 38.22, section 3 prohibits the admission of an accused's oral statement made as a result of custodial interrogation unless, among other prerequisites, the *Miranda* warnings and one additional warning prescribed in article 38.22 were given, and the accused knowingly, intelligently and voluntarily waived any rights set out in the warnings. *See id.* § 3(a).

At the suppression hearing, Officer Crowder, Investigator Martinez, Officer Nabors, and Sergeant Wyers testified. The officers each described their respective roles in the investigation surrounding the complainant's death. Each officer undertook separate parts of the investigation at or about the same time. The investigation was a fluid process that unfolded bit by bit as the officers compiled information and evidence simultaneously. The trial court ruled that appellant was not in custody when he made the statements at the scene and at the police station. The trial court found that there was no

12

probable cause for a formal arrest "even up to the very end of the conversations." According to the trial court's findings, appellant was not significantly deprived of his freedom, and he was not under arrest, in custody, or clearly the focus of a murder investigation at the time he gave statements to the officers. The trial court found appellant's statements to be voluntary and that—even to the extent appellant was being interrogated—because he was not in custody—officers were not required to have given appellant *Miranda* warnings.

It is undisputed that the officers did not give appellant these warnings until Sergeant Wyers spoke with appellant at the police station. When appellant asked for an attorney, Sergeant Wyers terminated the interview. Appellant refers to being handcuffed for a long period of time and being in a "strong police presence over a matter of hours" as creating a situation in which he was not free to leave, and was in police custody, such that his statements made at the scene and at the police station should have been suppressed. Consequently, we must determine whether the statements appellant made at the scene and at the police station (before Sergeant Wyers read appellant these warnings) were made as a result of custodial interrogation.

"Custodial interrogation" means "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda*, 384 U.S. at 444. "A person is in 'custody' only if, under the circumstances, a reasonable person would believe that his freedom of movement was restrained to the degree associated with a formal arrest." *Dowthitt v. State*, 931 S.W.2d 244, 254 (Tex. Crim. App. 1996) (citing *Stansbury v. California*, 511 U.S. 318, 322, 114 S. Ct. 1526, 128 L. Ed. 2d 293 (1994)). Under this reasonable-person standard, we presume that person is innocent. *Id.*

The "custody" determination must be made on a case-by-case basis considering all objective circumstances of the interrogation. *Stansbury*, 511 U.S. at 323; *Dowthitt*, 931 S.W.2d at 255. We consider four factors in determining whether a person is in custody:

13

(1) probable cause to arrest; (2) subjective intent of the police officers; (3) focus of the investigation; and (4) subjective belief of the accused. *Dowthitt*, 931 S.W.2d at 254. The subjective intent of law enforcement officers to arrest is irrelevant unless the intent is somehow communicated or otherwise manifested to the suspect. *Dowthitt*, 931 S.W.3d at 254.

Four general situations may constitute custody: (1) when a suspect is physically deprived of his freedom of action in any significant way; (2) when a law-enforcement officer tells a suspect he cannot leave; (3) when a law-enforcement officer creates a situation that would lead a reasonable person to believe that his freedom of movement has been significantly restricted; and (4) when there is probable cause to arrest and law-enforcement officers do not tell the suspect he is free to leave. *Dowthitt*, 931 S.W.3d at 255. The mere fact that an interrogation begins as noncustodial does not prevent custody from arising later; police conduct during the encounter may cause a consensual inquiry to escalate into custodial interrogation. *Id.* at 255. A person is "in custody" only if, under the totality of the circumstances, a reasonable person would believe that his freedom of movement was restrained to the degree associated with a formal arrest. *See Stansbury*, 511 U.S. at 322; *Dowthitt*, 931 S.W.2d at 254.

The record does not reflect that any officer communicated to appellant that he was not free to leave. The record reflects two times in which appellant was placed in handcuffs, both of which were intended as protocol for an ongoing investigation or for officer safety. Even though Officer Crowder testified that appellant was not free to leave once he placed appellant in handcuffs at the scene for preservation of evidence, the officer did not tell appellant he was not free to leave. *See Dowthitt*, 931 S.W.2d at 254 (requiring manifestation by words or conduct of an officer). According to the record, appellant appeared to understand that the handcuffs were intended for preservation of evidence. The record reflects that after appellant's handcuffs were removed at the scene,

he was free to leave—and, in fact, did leave the house briefly to go outside before returning inside to speak with officers and ultimately depart for the police station.

Appellant complains that officers detained him, handcuffed him, and participated in a "show of force" that made it obvious he could not leave. A person may be detained for the purpose of conducting a police investigation without being "in custody." *See id.* An officer conducting a temporary investigative detention may use such force as is reasonably necessary to effect the goal of detention: investigation, maintenance of status quo, or officer safety. *See Balentine*, 71 S.W.3d at 771; *Rhodes v. State*, 945 S.W.2d 115, 117 (Tex. Crim. App. 1997); *Dang v. State*, 99 S.W.3d 172, 182–84 (Tex. App.—Houston [14th Dist.] 2002), *reversed on other grounds by*, 154 S.W.3d 616 (Tex. Crim. App. 2005) (concluding that a juvenile's temporary detention inside of a police patrol unit for two-and-a-half hours was not unreasonable because the record did not reflect that the pace of the investigation at the scene was unreasonable). Being in handcuffs does not automatically equate with being in police custody or under arrest. *See Balentine*, 71 S.W.3d at 771; *Turner v. State*, 252 S.W.3d 571, 580 (Tex. App.—Houston [14th Dist.] 2008, pet. ref'd) (citing *Balentine*, 71 S.W.3d at 771). Officer Crowder testified that he placed appellant in handcuffs for the purpose of preserving evidence until the gunshot-residue test had been conducted. Officer Crowder explained to appellant that the need for handcuffs was to preserve any evidence and was protocol for any witnesses present in the home at the time of the shooting; appellant appeared to understand this explanation. An officer may place an accused in handcuffs in order to safely investigate the scene and preserve the status quo. *See Zayas v. State*, 972 S.W.2d 779, 790 (Tex. App.—Corpus Christi 1998, pet. ref'd) (concluding trial court had enough information to have reasonably concluded that an accused was not under arrest when officer immediately conducted investigation on the scene and questioned the accused). The record reflects that for the duration appellant was in handcuffs at his home, the investigation was ongoing. *See Dang*, 99 S.W.3d 172, 182–84. As to appellant's assertion that the officers on the scene demonstrated a "show of force," the record reflects that Officer Crowder

15

entered the home with his weapon unholstered because he was not certain whether the scene had been secured after the shooting or whether more people were in the home with firearms; the record does not reflect that officers drew their weapons at any other time at the scene. Just because appellant was the focus of an investigation did not convert the investigative detention into custody or an arrest. *See State v. Stevenson*, 958 S.W.2d 824, 829 (Tex. Crim. App. 1997).

Appellant claims that the presence of the crime-scene investigators and the homicide investigators at the scene demonstrated the officers' subjective intent that the officers had developed probable cause to arrest and that they were not investigating a suicide. But, each of the officers testified that he had no probable cause to arrest appellant. The officers testified that they were investigating a suicide. As the investigation continued to unfold, additional information came to light, but the officers testified that they did not have probable cause to arrest appellant. The trial court was in the best position to evaluate the credibility of the witnesses. *See Turner*, 252 S.W.3d at 581. According to the officers, at no point prior to appellant being *Mirandized* was he under arrest. *See Gardner v. State*, 306 S.W.3d 274, 293–94 (Tex. Crim. App. 2009) (involving evidence that officers did not have probable cause to arrest an accused).

Appellant complains he was told to make a formal statement at the station and was transported in a marked patrol cruiser while he wore handcuffs, amounting to custody. Stationhouse questioning in and of itself does not constitute custody. *Nickerson v. State*, 312 S.W.3d 250, 256 (Tex. App.—Houston [14th Dist.] 2010, no pet.). The record reflects that Sergeant Wyers and Investigator Martinez each explained to appellant the purpose in speaking with him both at the scene as part of the investigation and later in appellant's giving a formal, eyewitness statement at the police station to aid the investigation. According to Investigator Martinez, appellant appeared willing to go to the station and give the statement. *See Gardner*, 306 S.W.3d at 294 (involving evidence that appellant appeared to go voluntarily to a sheriff's office to talk to officers). If police

16

officers request that a person speak with them and the person is acting on this request without force, threat, or coercion, then the act is voluntary and the person is not in custody. *See Nickerson*, 312 S.W.3d at 257 (concluding that accused was not in custody even when some evidence at the suppression hearing reflected that as many as twenty officers with guns drawn had taped brown bags to the accused's handcuffed hands, but when the accused was not threatened or forced to go with the officers in an unmarked police cruiser to police station to make a voluntary statement as requested by officers); *Turner*, 252 S.W.3d at 580 (concluding that accused voluntarily accompanied the officers to the station and subsequent handcuffing did not transform the accompaniment into an arrest). The record reflects sufficient evidence to determine that appellant voluntarily accompanied the officers to the police station. *See Turner*, 252 S.W.3d at 580.

The officers testified that department protocol, for the officers' safety, required handcuffing any witness or suspect who was to be transported in a police unit. Placing appellant in handcuffs is reasonably necessary force to effect officer safety. *See Balentine*, 71 S.W.3d at 771. Moreover, placing a person in handcuffs does not automatically mean that person is in custody. *See Turner*, 252 S.W.3d at 580. The officers claimed to have had no probable cause to arrest appellant at the time appellant left the scene and that appellant was not a suspect at the time he departed for the police station. *See id.* (involving evidence that officers had no probable cause to arrest a witness who was involved in incident, but handcuffed the witness during transport to the police station to give a formal statement of the incident). Sergeant Wyers answered affirmatively when asked specifically, "Did you explain to the defendant about going to the station and getting a formalized statement?" The record does not affirmatively reflect that the officers explained to appellant that handcuffs were part of protocol in transporting witnesses. An officer's motivation in handcuffing a witness for officer safety, without explaining why the handcuffs were used, does not speak to how the officer's actions would be reasonably understood. *See id.* at 582. However, the record reflects the following: appellant was told by at least two officers of the purpose in giving

17

a formal eyewitness statement at the station and he appeared to understand; he voluntarily accompanied the officers to the station; he was placed in handcuffs only after consenting to accompany the officers; the handcuffs were used for the relatively short trip to the station[3]; and the handcuffs were removed shortly after arriving at the station. *See id.* at 580–82 (involving evidence that handcuffs were placed on witness after he consented accompany officers in a police unit to give statement at stationhouse thirty miles away and the handcuffs were removed upon arrival at police station). In considering the totality of the circumstances, an objective person reasonably could have believed appellant was a witness who was voluntarily accompanying officers to give a statement of the events he saw and that he was not in custody. *See id.* at 582 (considering officer's subjective intent manifested in words to the accused).

In sum, having considered all the objective circumstances, we conclude that the trial court did not abuse its discretion in determining that appellant was not significantly deprived of his freedom and he was not under arrest, in custody, or the focus of a murder investigation at the time he gave statements to the officers at the scene and later at the police station while making his recorded statement. *See Nickerson*, 312 S.W.3d at 257. Based on the evidence, appellant was not physically deprived of his freedom, never told he could not leave, never restricted in his movement in a way that would be tantamount to arrest, or a subject with enough probable cause to arrest him at the scene. *See id.* Likewise, appellant was not in custody when he was escorted from his home to the police station. *See id.* For this reason, article 38.22 was not applicable in that appellant was not in custody at the time he made any of the statements. *See* Tex. Code Crim. Proc. Ann. art. 38.22. The trial court did not abuse its discretion in denying appellant's motion to suppress the statements appellant made at the scene and at the police station. *See Turner*, 252 S.W.3d at 580. Appellant's second issue is overruled.

---

[3] The record suggests that the drive to the station could have been as short as fifteen minutes.

18

Having overruled each of appellant's issues, we affirm the trial court's judgment.


/s/    Kem Thompson Frost
Justice


Panel consists of Justices Frost, Seymore, and Jamison.

Do Not Publish — Tex. R. App. P. 47.2(b).